## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

LISA TOMPKINS,                              :
                                           :
                        Plaintiff,         :
                                           :     **Civil Action No. 12-1897 (SRC)**
              v.                           :
                                           :     **OPINION**
MICHAEL J. ASTRUE,                         :
COMMISSIONER OF SOCIAL SECURITY            :
                                           :
                        Defendant          :
                                           :
                                           :

---

**CHESLER,** District Judge

## INTRODUCTION

Plaintiff Lisa Tompkins, pursuant to 42 U.S.C. §§ 1383(c)(3), 405(g), seeks review of the Commissioner of Social Security Administration's ("the Commissioner") decision denying her application for Social Security Disability Benefits.  Plaintiff argues that the decision is not supported by substantial evidence and should be reversed.  For the reasons set forth in this Opinion, this Court finds the Commissioner's decision is supported by substantial evidence and will be affirmed.

## PROCEDURAL HISTORY

On August 27, 2009, Plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning November 30, 2004, pursuant to Sections 216(i) and 223(d) of the Social Security Act, codified as 42 U.S.C. §§ 416(i) and 423, respectively.  Plaintiff alleges disabilities of morbid obesity, chronic left femoral nerve neuropathy, and the effects of surgery on her left knee in 2004.  (Tr. 12).  Plaintiff appeared and

1

testified at a hearing held before Administrative Law Judge Donna A. Krappa ("ALJ Krappa") on June 6, 2011.  ALJ Krappa issued a decision on July 21, 2011, finding that Plaintiff was not eligible for Social Security disability benefits based upon her disabilities.  The following is a summary of the ALJ's findings:

1. As defined in the Social Security Act, Plaintiff was not under a disability at any time from November 30, 2004, the alleged onset date, through December 31, 2009, the date last insured.
2. Plaintiff was not engaged in "substantial gainful activity" during the period between the alleged onset date of her disability and the date she was last insured.
3. Through the date last insured, Plaintiff did have the following "severe" impairments: the residual effects of left knee surgery in 2004; chronic left femoral nerve neuropathy; and morbid obesity.  However, through the date last insured, Plaintiff did not have an impairment or combination of impairments that matched or medically equaled one of the impairments listed in the Regulations.
4. Plaintiff remains capable of performing the exertional, postural, and environmental demands of sedentary work.
5. Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms and pain; however, Plaintiff's statements regarding the intensity, persistence and limiting effects of those symptoms are not credible insofar as they conflict with the residual functional capacity assessment for sedentary work within the postural, exertional, and environmental limitations provided.
6. Plaintiff's allegedly severe fibromyalgia, anxiety, and depression are not supported by the medical record.
7. Plaintiff's morbid obesity does not produce any additional or cumulative effects that would limit Plaintiff's ability to perform sedentary work.  Plaintiff's obesity was considered in the analysis of her alleged disability, but it has not caused or aggravated any other medical ailments.

On September 15, 2011, Plaintiff filed a request for review of the ALJ's decision.  On March 8, 2012, the Social Security Appeals Council denied Plaintiff's request.  Pursuant to 42 U.S.C. §§ 1383(c) and 405(g), Plaintiff filed the instant action, seeking review of the Commissioner's decision.

## STATEMENT OF FACTS

### A.  Background

Plaintiff, Lisa Tompkins, born February 26, 1959, is a 54-year-old United States citizen who resides in Middlesex, New Jersey with her teenage son.  (Tr. 17-18, 130, 150).  She is 5'1" tall and weighs 250 pounds.  (Tr. 15).

Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2009.  (Tr. 15).  She completed her initial application on October 2, 2009.  (Tr. 130).  Plaintiff claims that, starting November 30, 2004, her disabling condition has prevented her from working.  (Tr. 33, 130).

Prior to the onset of her alleged disabling condition, Plaintiff worked as a cost analyst manager for AT&T, a sedentary position.  (Tr. 17).  Plaintiff had a good work record at AT&T, starting in the late 1970s and going through 2004, when Plaintiff was making close to $90,000 per year.  (Tr. 33).  Plaintiff worked regularly until October 2003, after which she went through two short-term disability periods, one related to problems with her knee and one due to a combination of knee problems and pneumonia.  (Tr. 38, 56).  She stopped working after she was laid off in November of 2004.  (Tr. 17).  Plaintiff reports that she had two jobs after her layoff from AT&T, but that her impairments made it impossible for her to successfully complete her assigned tasks.  (Tr. 18).  For instance, when she worked in a pediatrician's office, she was physically unable to climb up on a stool to reach the files and was fired after one day.  (Tr. 18, 56).

### B.  Claimed Disabilities

Beginning November 30, 2004, Plaintiff claims disability due to morbid obesity, chronic left femoral nerve neuropathy, and the residual effects of a 2004 surgery on her left knee.  (Tr.

3

12).  Plaintiff states that she cannot work because she cannot sit or stand for extended periods of time.  (Tr. 18).

Plaintiff claims that she suffers from the adverse residual effects of left knee surgery, which include severe pain and swelling.  (Tr. 18, 42).  On February 24, 2004, Plaintiff underwent arthroscopic resection surgery on her left knee.  (Tr. 19, 198).  From November 2003 to April 2004, Plaintiff required outpatient care to address left knee pain and to help with her difficulty walking.  (Tr. 19).  At the time the ALJ denied disability benefits in 2011, Plaintiff still complained of swelling, pain, inability to stand and walk, a limping gait, and weakness of the lower left leg.  (Tr. 19).

Plaintiff claims that she suffers from chronic left femoral nerve neuropathy that painfully affects her entire left leg.  (Tr. 30).  On June 16, 2004, Plaintiff underwent electromyographic nerve conduction studies to investigate her complaints of left leg pain and weakness, the results of which were consistent with chronic left femoral neuropathy.  (Tr. 19).  On December 3, 2009, Dr. Weber examined Plaintiff and confirmed the prior diagnosis based on evidence of reduced muscle strength in the lower left leg.  (Tr. 19).  On June 3, 2010, Plaintiff was examined by Dr. Robert Walsh, who again confirmed the diagnosis of chronic left femoral neuropathy and added a secondary diagnosis of "disorders of muscle, ligament, and fascia, internal derangement of left knee, s/p surgery."  (Tr. 74).  Even with these diagnoses, however, Dr. Walsh opined that Plaintiff was "not disabled" through December 31, 2009.  (Tr. 74).

Plaintiff's treating physician, Dr. Sharon, diagnosed her with fibromyalgia and prescribed Savella.  (Tr. 297-98, 300-01).  His report from her June 21, 2010 appointment states that Plaintiff had "mild tenderness" to palpation present on the left lower extremity and that there was "no pain on motion."  (Tr. 298, 301).

4

In addition to her physical ailments, Plaintiff claims to have mental difficulties with focusing and remembering that would affect her ability to return to work.  (Tr. 18).  Plaintiff used to balance budgets as a part of her cost analyst manager position at AT&T, but states that she could no longer handle that task because of pain and trouble focusing.  (Tr. 54).

### C.  Medical Testimony Considered by the ALJ

##### a.  <u>Medical Testimony of Dr. Fechner, board-certified expert in internal medicine</u>

Based on his review of the medical records, Dr. Fechner stated that Plaintiff had three diagnoses: (1) obesity; (2) left knee meniscus tear and patella softening (corrected by surgery in February 2004); and (3) chronic left femoral nerve neuropathy.  (Tr. 63-65).

Dr. Fechner testified that, at 5'1" tall and 250 pounds, Plaintiff was considered obese under medical guidelines.  Dr. Fechner stated that the record shows that Plaintiff had left knee surgery in February 2004 for a lateral meniscus tear and that a June 2004 EMG showed that Plaintiff suffers from chronic left femoral nerve neuropathy.  (Tr. 64).  He also stated that, although fibromyalgia is reported in the record, the fact that there is no conclusive medical test for the ailment makes him unable to conclusively state whether or not she suffers from it.  (Tr. 15).

Dr.  Fechner notes that, although Plaintiff was using a cane at the time of the hearing, she had not been using one when Dr. Weber saw her in December 2009, even though she did present with an antalgic gait to the left.  (Tr. 15, 65-66).  At the time, Dr. Weber tested Plaintiff's left side and found weakness, but only rated it a 4/5.  (Tr. 65).  The x-rays of her left knee were radiographically within normal limits.  (Tr. 65-66).

Dr. Fechner stated that he did not believe Plaintiff's obesity would affect her left femoral nerve neuropathy, but that her weight would "not be good for" her knee and "might be

deleterious" to her hip.  (Tr. 67).  However, Dr. Fechner qualified his assessment of the effect of weight on Plaintiff's hip because he had never seen an MRI or x-ray of her hip.  (Tr. 67).

Dr. Fechner testified that, based on his review of the medical records, Plaintiff's impairments did not meet or equal any of the listings, either singly or in combination.  (Tr. 66).  He further stated that he believed Plaintiff's capacity to work was restricted by the end of 2009 (Plaintiff's date last insured), but that she remained capable of sedentary work at the time of his testimony in 2011.  (Tr. 66).  Dr. Fechner found that Plaintiff could handle sedentary work within the following guidelines: (1) no more than two hours aggregate of standing and walking throughout an eight hour day; (2) lifting ten pounds occasionally; (3) sitting for six hours in an eight hour day with breaks to stretch every hour; (4) no crawling or need to access high places; and (5) no more than occasional bending and stooping.  (Tr. 66-68).

D.  **Expert Testimony Considered by the ALJ**

a.  Expert Testimony of Rocco Meola, Vocational Expert

Mr. Meola reviewed the vocational evidence for Plaintiff's case in the context of the Dictionary of Occupational Titles.  (Tr. 71).  He rated her cost analyst manager position as a sedentary job on the high-end of semi-skilled occupations.  (Tr. 69).  Based on the ALJ's finding that Plaintiff had the residual functional capacity for sedentary work with the stated exertional, postural, and environmental limitations, Mr. Meola opined that Plaintiff would be able to return to her prior work.  The ALJ credited this expert opinion in finding that Plaintiff had the residual functional capacity to perform her prior job as it was actually performed.  (Tr. 21-22).

During his testimony, ALJ Krappa presented Mr. Meola with a series of hypotheticals, each time adding additional restrictions, and asking Meola what jobs, if any, a person with such impairments would be capable of performing.  (Tr. 69-71).

6

Mr. Meola testified that a person with the restrictions described by Dr. Fechner due to Plaintiff's impairments could perform the work of a cost analyst manager.  (Tr. 70).  If Plaintiff had the same exertional restrictions, but was further limited to only unskilled or repetitive work, Mr. Meola stated that she would still be capable of performing the work required of a document prep worker, telephone quotation clerk, order clerk, scale operator, hand mounter, and or any other job of a similar type.  (Tr. 70).  Mr. Meola testified that about 1,000 of such jobs exist in the northern and central parts of New Jersey, and about 35,000 such jobs exist nationally.  (Tr. 71).

## DISCUSSION

### A.  Standard of Review

This Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g).  This Court must affirm the Commissioner's decision if it is "supported by substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Stunkard v. Sec'y of Health and Human Services, 841 F.2d 57, 59 (3d Cir. 1988); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence "is more than a mere scintilla of evidence but may be less than a preponderance."  McCrea v. Comm'r of Soc. Sec., 370 F.2d 357, 360 (3d Cir. 2004).  The reviewing court must consider the totality of the evidence and then determine whether there is substantial evidence to support the Commissioner's decision.  See Taybron v. Harris, 667 F.2d 412, 413 (3d Cir. 1981).

The reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir.

1992), cert. denied sub nom.; Williams v. Shalala, 507 U.S. 924 (1993) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).  If the ALJ's findings of fact are supported by substantial evidence, this Court is bound by those findings, "even if [it] would have decided the factual inquiry differently."  Fargnoli v. Massanari, 247 F.3d 34, 35 (3d Cir. 2001); see also Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

In determining whether there is substantial evidence to support the Commissioner's decision, the reviewing court must consider: "(1) the objective medical facts; (2) the diagnoses and expert opinions of treating and examining physicians on subsidiary questions of fact; (3) subjective evidence of pain testified to by the claimant and corroborated by family and neighbors; (4) the claimant's educational background, work history, and present age."  Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1973).  "The presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision."  Sassone v. Comm'r of Soc. Sec., 165 F. App'x 954, 955 (3d Cir. 2006) (citing Blalock, 483 F.2d at 775).

### B.  Standard for Awarding Benefits Under the Act

The claimant bears the initial burden of establishing his or her disability.  42 U.S.C. § 423(d)(5).  To qualify for Social Security disability benefits, a claimant must first establish that he is needy and aged, blind, or "disabled."  42 U.S.C. § 1381.  A claimant is deemed "disabled" under the Act if she is unable to "engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see also Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987). Disability is predicated on whether a claimant's impairments are so severe that he "is not only

unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."   42 U.S.C. § 423(d)(2)(A).  Finally, while subjective complaints of pain are considered, alone, they are not enough to establish disability.  42 U.S.C. § 423(d)(5)(A).  To demonstrate that a disability exists, a claimant must present evidence that her affliction "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically accepted clinical and laboratory diagnostic techniques."   42 U.S.C. § 423(d)(3).

C.  **The Five-Step Evaluation Process**

Determinations of disability are made by the Commissioner pursuant to the five-step process outlined in 20 C.F.R. § 404.1520.  The claimant bears the burden of proof at steps one through four.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

At step one, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity, which is "work that involves doing significant and productive physical or mental duties; and is done (or intended) for pay or profit."   20 C.F.R. § 404.1510, .1520.  If a claimant is found to be engaged in such activity, then the claimant is not "disabled" and the disability claim will be denied.  Id.; Yuckert, 482 U.S. at 141.

At step two, the Commissioner must determine whether the claimant is suffering from any severe impairments.  20 C.F.R. §§ 404.1520(a)(ii), (c).  An impairment is severe if it "significantly limits [a claimant's] physical or mental ability to do basic work activities."  Id.  In making this determination, the age, education, and work experience of the claimant will not be considered.  Id.  If a severe impairment is found, the inquiry proceeds to step three.

At step three, the Commissioner compares the medical evidence of the claimant's impairment(s) with the impairments presumed severe enough to preclude any gainful work,

listing in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See 20 C.F.R. § 404.1594(f)(2).  If a claimant's impairment meets or equals one of the listed impairments, he will be found disabled under the Social Security Act.  If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to step four.

In Burnett v. Commissioner of Social Security, the Third Circuit found that to deny a claim at step three, the ALJ must specify which listings[1] apply and give reasons why those listings are not met or equaled.  220 F.3d 112, 119-20, 120 n.2 (3d Cir. 2000).  In Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004), however, the Third Circuit noted that "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis.  Rather, the function of Burnett is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review."  Id.  An ALJ satisfies this standard by "clearly evaluating the available medical evidence in the record and then setting forth that evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant listing."  Scatorchia v. Comm'r of Soc. Sec., 137 F. App'x 468, 471 (3d Cir. 2005).

Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform is past relevant work.  20 C.F.R. § 404.1520(e).  If the claimant is able to perform is past relevant work, he will not be found disabled under the Act.  In Burnett, the Third Circuit set forth the analysis at step four:

> In step four, the ALJ must determine whether a claimant's residual functional capacity enables her to perform her past relevant work. This step involves three substeps: (1) the ALJ must make specific findings of fact as to the claimant's residual functional capacity; (2) the ALJ must make findings of the physical and mental demands of the claimant's past relevant work; and (3) the ALJ must compare the residual functional capacity to the past relevant work to determine whether the claimant has the level of capability need to perform the past relevant work.

---

[1] Hereinafter, "listing" refers to the list of severe impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1.

Burnett, 220 F.3d at 120.  If the claimant is unable to resume his past work, and his condition is deemed "severe," but is not listed, the evaluation moves to the final step.

At step five, the burden of proof and production shifts to the Commissioner, who must demonstrate that there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and residual functional capacity.  20 C.F.R. §§ 404.1512(g), 404.1560(c)(1).  If the ALJ finds a significant number of jobs that claimant can perform, the claimant will not be found disabled.  Id.

Additionally, pursuant to 42 U.S.C. § 423(d)(2)(B), the Commissioner, throughout the five-step process, "must analyze the cumulative effect of the claimant's impairment in determining whether she is capable of performing work and is not disabled."  Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999); 20 C.F.R. § 1523.  At every step, "the ALJ's decision must include sufficient evidence and analysis to allow for meaningful judicial review," but it need not "adhere to a particular format."  See, e.g., Rivera v. Commissioner, 164 F. App'x 260, 262 (3d Cir. 2006).  However, in the first four steps of the process, Plaintiff bears the burden of proving that the impairments in combination are severe enough to qualify her for benefits.  See Williams v. Barnhart, 87 F. App'x 240, 243 (3d Cir. 2004) (Plaintiff bears burden of showing how a combination-effects analysis would have resulted in a qualifying disability.)

D.  **ALJ Krappa's Findings**

ALJ Krappa followed the five-step sequential evaluation and determined that Plaintiff was not disabled within the meaning of the Act.  (Tr. 22).

ALJ Krappa held that Plaintiff satisfied the first step because she has not engaged in substantial gainful activity since the onset of her alleged disability in November 2004.  (Tr. 15).

11

At step two, ALJ Krappa found that Plaintiff has "the following 'severe' impairments: the residuals of left knee surgery (remote – 2004); chronic left femoral never neuropathy, and morbid obesity (20 CFR 404.1520(c))."  (Tr. 15).

At step three, ALJ Krappa concluded that none of Plaintiff's severe ailments, or alleged severe ailments, met or medically equaled, alone or in combination, any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ also considered Plaintiff's subjective complaints of debilitating pain and concluded that, although Plaintiff's diagnosed severe ailments could be reasonably expected to cause her pain, Plaintiff's allegations concerning the severity, persistence, and debilitating effects of the pain were not credible where they contradicted the assessment of Plaintiff's residual functional capacity for sedentary work.  (Tr. 19).  The ALJ made this determination based on a lack of evidence of severe pain, a lack of any treatment records of the alleged effects of Plaintiff's 2004 knee surgery, and Plaintiff's continued ability to perform the tasks of daily life. (Tr. 19-20).

At step four, the ALJ found that Plaintiff was capable of handling the exertional, postural, and environmental demands of sedentary work.  (Tr. 16-17).  Plaintiff can handle the following exertional demands: (1) lift or carry ten pounds occasionally; (2) stand or walk for two hours during an eight hour work day; (3) sit for six hours during an eight hour work day, if given the opportunity to stand and stretch for three to five minutes every forty-five minutes to one hour; and (4) perform unlimited pushing and pulling within the ten pound weight restriction.  (Tr. 16-17).  Plaintiff can handle sedentary positions with the following postural and environmental demands: (1) no required use of ladders, ropes, or scaffolds; (2) only occasional use of stairs or ramps; (3) only frequent – as opposed to continuous – stooping; (4) only occasional balancing,

kneeling, crouching, and/or crawling; and (5) no concentrated exposure to wetness, humidity, and/or temperature extremes.  (Tr. 16-17).  Thus, as Plaintiff's former job at as a cost analyst manager was a sedentary position, the ALJ concluded that, even within the given exertional, postural, and environmental restrictions, Plaintiff would be able to perform her past job as it was previously performed.  (Tr. 21-22).

ALJ Krappa also considered the effect of Plaintiff's obesity on her severe impairments. On December 3, 2009, Plaintiff was examined by Dr. Weber, who listed her height as 4'11" and her weight as 242 pounds, and diagnosed her as morbidly obese according to New Jersey State Agency guidelines.  (Tr. 20).  The ALJ noted, however, that nothing in the medical record referenced any functional limitations associated with Plaintiff's weight.  (Tr. 20).  The ALJ found that Plaintiff's obesity neither aggravated any of her other severe impairments nor provided any basis to further limit Plaintiff's residual functional capacity.  (Tr. 20).

E.  **Analysis**

Plaintiff contends that ALJ Krappa's decision should be reversed because substantial evidence in the administrative record exists to support a finding of disability.  (Pl.'s Mem. L. at 1).  Plaintiff contends that: (1) ALJ Krappa erred in dismissing Plaintiff's subjective complaints of pain; (2) ALJ Krappa erred in failing to list Plaintiff's fibromyalgia, anxiety, and depression among the severe impairments; (3) ALJ Krappa failed to combine all of Plaintiff's severe impairments and compare them against the listings; (4) ALJ Krappa erred when she failed to mention or consider the Commissioner's special rulings regarding the consideration of obesity; (5) ALJ Krappa erred by failing to perform a task-by-task comparison between Plaintiff's past work and her residual functional capacity; and (6) ALJ Krappa erred by disregarding evidence from Plaintiff's treating physician.  (Pl. Mem. L. at 9-10).

1.   **Are Plaintiff's Subjective Complaints of Severe Pain Supported by the Medical Record?**

Plaintiff claims that the ALJ improperly disregarded her subjective complaints of severe pain.  The Regulations state that subjective reports of pain must be considered as a factor in the ALJ's analysis.  20 CFR 404.1529(c).  Since pain cannot be quantified, subjective "assertions of pain must be given serious consideration," Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981).  Plaintiff, however, still bears the burden of producing evidence to support her subjective complaints of severe pain.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987) (the Plaintiff bears the burden of proof at the first four steps).   Accordingly, subjective claims of pain and impairment "will not alone establish . . . [disability]; there must be medical signs and laboratory findings . . . [demonstrating] medical impairments, which could reasonably be expected to produce the pain or other symptoms alleged."   20 C.F.R. § 404.1529(a).  In other words, while there must be objective evidence of a condition that could cause the pain alleged, there need not be objective evidence of the pain itself.  Green v. Schweiker, 749 F.2d 1066 (3d Cir. 1984).  It is within an ALJ's discretion to discount Plaintiff's subjective complains of severe pain if the ALJ has considered Plaintiff's complaints and can "specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record."   Matullo v. Bowen, 926 F.2d 240, 245 (3d Cir.1990).

In this case, the medical record was insufficient to support Plaintiff's claims of severe pain, and thus it was appropriate for the ALJ to discount her claims.  Although the medical record shows that Plaintiff was treated by various physicians over the years for chronic left femoral nerve neuropathy, fibromyalgia, and the residual effects of her 2004 left knee surgery, (Tr. 19), the record does not support Plaintiff's allegations of the severity of the pain caused by her impairments.  For instance, according to Dr. Weber's December 2009 report, although

Plaintiff presented with an antalgic gait to the left and with tenderness, weakness, and swelling in her left knee, x-rays of Plaintiff's knee joint were normal and did not show any evidence of the joint deformity that accompanies severe pain. (Tr. 19). Furthermore, in 2010, Plaintiff's treating physician, Dr. Yoram Sharon, described her as "in no acute distress" and stated that, while there was "mild tenderness" to palpation present in her lower left leg, there was "no pain on motion." (Tr. 298). Significantly, by the time of the ALJ's decision, Plaintiff had not sought treatment for either the allegedly debilitating painful effects of her left knee surgery or her chronic left femoral nerve neuropathy since 2004. (Tr. 20). Nor was there evidence that Plaintiff requested treatment for pain with pain-killers. (Tr. 20). A lack of evidence of either treatment or pain medication for conditions that allegedly cause Plaintiff severe pain undermines her allegations of the pain's severity.

Thus, the ALJ's decision to disregard Plaintiff's subjective claims of pain due to a lack of medical evidence was supported by substantial evidence. (Tr. 19-20).

### 2. Did the ALJ Err by Not Including Plaintiff's Alleged Fibromyalgia, Depression, and Anxiety among the Severe Impairments in Step Two?

At step two, the ALJ's decision acknowledges the following severe impairments: (1) residuals of left knee surgery, (2) chronic left femoral nerve neuropathy, and (3) morbid obesity. Plaintiff asserts that the ALJ erred by not acknowledging Plaintiff's alleged fibromyalgia, anxiety, and depression as severe impairments.

The step two inquiry is a *de minimis* screening device to dispose of groundless claims. Bowen v. Yuckert, 482 U.S. 137 (1987). The analysis at step two is independent of the analysis at later steps. Inclusion or exclusion of particular impairments at step two does not affect the ultimate disability determination.

### 3.   Did the ALJ Properly Consider the Combined Effects of Plaintiff's Severe Impairments as Required by 42 U.S.C. § 423(d)(2)(B)?

Plaintiff claims that ALJ Krappa erred because she failed to consider the combined effect of Plaintiff's ailments.  Throughout the five step process, the ALJ is obligated to consider all of the alleged impairments individually and in combination.  42 U.S.C. § 423(d)(2)(B).  However, Plaintiff still bears the burden in the first four steps of the analysis of demonstrating how her impairments, whether individually or in combination, amount to a qualifying disability.  Burnett v. Comm'r of Soc. Sec, 220 F.3d 112, 118; Williams v. Barnhart, 87 F. App'x 240, 243.  Moreover, even if Plaintiff can demonstrate that the ALJ did not consider her impairments in combination, the claimant still bears the burden of demonstrating an inability to return to her past relevant work.  Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994).

Plaintiff asserts that ALJ Krappa did not properly consider the impairments in combination, especially with regard to her obesity.  (Pl.'s Mem. L. at 14).  In the opinion, ALJ Krappa included a section, in addition to further analysis elsewhere in her opinion, devoted to discussing the combined impact of Plaintiff's impairments.  (Tr. 16, 20).  In analyzing the evidence, the ALJ is not obligated to employ particular "magic words" (Sassone v. Comm'r of Soc. Sec., 165 F. App'x 954, 959 (3d Cir. Jan. 20, 2006) (citing Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004))), or adhere to a particular format in explaining her decision.  Jones, 364 F.3d at 505.  The ALJ must only ensure "that there is sufficient development of the record and explanation of findings to permit meaningful review."   Jones, 364 F.3d at 505.

In light of these standards, ALJ Krappa's opinion shows that she adequately considered Plaintiff's impairments in combination, assessed their combined severity, and properly analyzed their impact on Plaintiff's ability to perform past relevant work.  ALJ Krappa evaluated the severity of all of Plaintiff's claimed impairments – fibromyalgia, chronic left femoral nerve

16

neuropathy, residuals of left knee surgery, anxiety, depression, severe pain, and morbid obesity –
and found that none of them were severe enough to be disabling, though the effects of her
impairments were sufficient to limit her to sedentary occupations.  ALJ Krappa also specifically
addressed  the question of the combination of obesity with other severe impairments, stating that,
while Plaintiff is morbidly obese, nothing in the medical record referencing Plaintiff's weight
indicates any associated adverse impact on her other conditions, or any functional limitations due
to the combined effects of her morbid obesity.  (Tr. 20).  Thus, the ALJ concluded that there was
no evidence that Plaintiff's obesity has "caused or aggravated any other medical ailments."   (Tr.
20).

ALJ Krappa's step-by-step analysis of each impairment, both the ones she ruled were
severe and those Plaintiff claimed were severe, demonstrates that she considered each
impairment in combination with Plaintiff's other impairments with regard to Plaintiff's ability to
function in the workplace.  For example, with respect to Plaintiff's claims of chronic left femoral
nerve neuropathy, residuals of left knee surgery, and severe pain, ALJ Krappa considered not
only the various medical diagnoses, but also engaged in an analysis of whether those
impairments, as supported by the record, would impact Plaintiff's ability to work.  (Tr. 20).  The
ALJ ruled that Plaintiff was restricted to sedentary work activity due to the combined effects of
her severe impairments.  (Tr. 20).

Furthermore, Plaintiff fails to show how the combination analysis might have been
performed differently so as to make a material difference by demonstrating an inability to return
to past relevant work.  Plaintiff merely claims that the ALJ failed to properly combine and
compare Plaintiff's ailments against the listings, which, Plaintiff claims, constitutes a reversible
error.  Plaintiff focuses this claim for the most part on ALJ Krappa's alleged failure to consider

the combined impact of Plaintiff's obesity, but bases that objection on the argument that "from a purely fact-finding point of view, it is counter-intuitive finding that a woman who limps because of joint disease and neuropathy affecting the same leg would have no limitations if 242 pounds are placed on that leg with every step."   (Pl.'s Mem. L. at 17).  The problem for Plaintiff is that she fails to point to any evidence in support of this argument.  Plaintiff bears the burden of proof on the first four steps of the analysis, and an appeal to common sense does not release Plaintiff from her obligation to meet that burden.

The record demonstrates that ALJ Krappa adequately considered the combined impact of Plaintiff's impairments in reaching her decision that the impairments, alone or in combination, do not result in a disabling impairment.

### 4.   Did ALJ Krappa Properly Consider the Impact of Plaintiff's Obesity?

Although similar to the allegation above – that ALJ Krappa failed to properly combine and consider Plaintiff's impairments – Plaintiff specifically objects to ALJ Krappa's alleged disregard of the effects of Plaintiff's obesity, both alone and in combination, on her other severe impairments.

In 2000, the Commissioner rescinded Paragraph 9.09 of the Listing of impairments, which had dealt exclusively with obesity; however, this was not meant to eliminate obesity as a cause of disability.  To replace Paragraph 9.09, the Commissioner implemented *SSR 00-3p, 2000 SSR LEXIS 5* to indicate how obesity should be considered.  Under the old Paragraph 9.09, there was an automatic designation of obesity as a Listed impairment if Plaintiff met the height and weight criteria; however, under the new SSR, obesity itself is not a Listed impairment, but is considered in combination with Plaintiff's severe impairments throughout the assessment.  In other words, under the new SSR, an ALJ must "meaningfully consider the effect of a claimant's

obesity, individually and in combination with her other impairments, on her workplace function at step three and at every subsequent step." Diaz v. Comm'r of Soc. Sec, 577 F.3d 500 (3d Cir. 2009).

ALJ Krappa found, based on the medical evidence provided, that Plaintiff's obesity, considered with her other impairments, did not limit Plaintiff's ability to perform sedentary work. (Tr. 20). ALJ Krappa considered Plaintiff's obesity in the analysis of her alleged disability, but found no evidence that it either caused or aggravated any of her severe impairments. (Tr. 20). Crucially, Plaintiff does not point to anything in the medical record which states any functional limitations associated with her weight. (Tr. 20).

The Third Circuit has held that the effect of a plaintiff's weight on her workplace function must be carefully considered. Diaz, 577 F.3d at 503-04. In Diaz, the Third Circuit found that the district court had not properly analyzed the cumulative effect of Plaintiff's obesity on her ability to function in the workplace. Id. at 504. An obesity analysis must be individualized to each case and courts must consider the combined impact of obesity on musculoskeletal, respiratory, and cardiovascular impairments. Id. at 503 (citing *SSR 00-3p*). In Diaz's case, she had severe impairments in all of the listed categories. Id. at 501-02. In the instant case, however, Plaintiff only has musculoskeletal severe impairments. (Tr. 15). Furthermore, although both Diaz and Plaintiff had severe knee impairments, Diaz's knee showed clear signs of joint degeneration, whereas Plaintiff's does not. Diaz, 577 F.3d at 506; Tr. 19. Diaz's impairments and associated complaints of severe pain were supported by x-rays and clinical evidence in the medical record indicating severe arthritis. Id. Plaintiff's record, however, contains only normal x-rays of her left knee and unsubstantiated subjective complaints of severe

pain.  (Tr. 19, 298) (Plaintiff's doctor stated that she presented with "mild tenderness" to palpation of the knee and was in "no acute distress").

Where Diaz's claims were amply supported by medical evidence, Plaintiff here has not pointed to any medical evidence to support her assertion that her obesity, in combination with other conditions, prevents her from performing her past relevant work.  Given that Plaintiff has the burden of proving disability in the first four steps of the analysis, the ALJ is "entitled to rely not only on what the record says, but also on what it does not say."  Lane v. Comm'r of Soc. Sec., 100 F. App'x 90, 95 (3d Cir. 2004) (citing Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983)).  In Plaintiff's case, substantial evidence supports the ALJ's ruling.  The ALJ did not err in her analysis regarding Plaintiff's obesity.

### 5.   Did ALJ Krappa Properly Conduct the Function-by-Function Analysis?

Plaintiff asserts that, at step four, ALJ Krappa failed to perform a function-by-function comparison of her residual functional capacity and her past work.   Residual functional capacity covers all activities that the Plaintiff remains capable of performing in spite of the limitations imposed by her severe impairments.  Burnett v. Commissioner, 220 F.3d 112, 121 (3d Cir. 2000).  The residual functional capacity assessment covers three substeps: "(1) the ALJ must make specific findings of fact as to the claimant's residual functional capacity; (2) the ALJ must make findings of the physical and mental demands of the claimant's past relevant work; and (3) the ALJ must compare the residual functional capacity to the past relevant work to determine whether claimant has the level of capability needed to perform the past relevant work."  Id.  at 120 (citing 20 C.F.R. § 404.1561; S.S.R. 82–62).   Thus, the function by function analysis requires that the ALJ compare the Plaintiff's residual functional capacity with the demands of

her prior work .   As a part of the "function by function" assessment, the Plaintiff's subjective complaints must also be considered.   Smith v. Califano, 637 F.2d 968 (3d Cir. 1981).

In this case, Dr. Fechner found that Plaintiff could handle sedentary work within the following guidelines: (1) no more than two hours aggregate of standing and walking throughout an eight hour day; (2) lifting ten pounds occasionally; (3) sitting for six hours in an eight hour day with breaks to stretch every hour; (4) no crawling or need to access high places; and (5) no more than occasional bending and stooping.  (Tr. 66-68).   Based on the evidence presented, ALJ Krappa credited this assessment of Plaintiff's residual functional capacity.   (Tr. 16-17).

The ALJ then properly compared that residual functional capacity assessment with the demands of Plaintiff's prior work by consulting a vocational expert, Mr. Meola.   Mr. Meola, evaluated Plaintiff's prior job as a cost analyst manager as a "semi-skilled" sedentary position. When the ALJ presented Mr. Meola with Dr. Fechner's guidelines as to Plaintiff's residual functional capacity, (Tr. 66-68) Mr. Meola stated that Plaintiff would be able to return to her prior work as it was performed, (Tr. 21-22) and that "nothing in [the residual functional capacity] limitation . . . would preclude her" from performing her past work as a cost analyst manager. (Tr. 70).

Based on this evidence, ALJ Krappa found that Plaintiff was capable of performing her past relevant work as a cost analysis manager, and that her past work would not require the performance of work-related activities precluded by the Plaintiff's residual functional capacity. (Tr. 21).   Although ALJ Krappa does not explicitly walk through every function of Plaintiff's prior work in minute detail to compare them with the residual functional capacity, there is no format to which an ALJ must adhere when giving her reasoning so long as "there is sufficient development of the record and explanation of findings to permit meaningful review."   Jones,

364 F.3d at 505.   ALJ Krappa did sufficiently assess whether Plaintiff could perform the tasks of her past relevant work under the restrictions imposed by her residual functional capacity. Plaintiff has not pointed to any specific function that the ALJ failed to cover.

### 6.   Was Evidence from Plaintiff's Treating Physician Properly Disregarded Where It Contradicted More Substantial Evidence from the Record?

Plaintiff asserts that ALJ Krappa erred by improperly disregarding evidence from Plaintiff's treating physician in favor of the DDS's reports and the testimony of medical experts. Specifically, Plaintiff asserts that ALJ Krappa improperly disregarded the letter that Dr. Sharon, Plaintiff's treating physician, wrote to the U.S. District Court of the District of New Jersey recommending that Plaintiff be excused from jury duty for medical reasons.   (Tr. 300-01).

It is an error of law to reject the treating physician's opinion without adequate medical contradiction, especially when said opinion is based on observation of the Plaintiff over time. Allen v. Brown, 881 F.2d 37, 41-42 (3d Cir. 1989); Diaz v. Comm'r of Social Security, 577 F.3d 500, 505-06 (3d Cir. 2009).  Thus, although an ALJ can discount evidence from Plaintiff's treating physician when a conflict exists, the ALJ must provide a reason for doing so.

In this case, Dr. Sharon's letter is hardly sufficient evidence to outweigh contrary evidence in the medical record.  On June 22, 2010, Dr. Sharon wrote a letter to the United States District Court for the District of New Jersey recommending that Plaintiff be excused from jury duty, stating that "due to her medical condition she is unable to sit or stand for long periods of time, unable to focus, and is not able to handle stressful situations."   (Tr. 300).  This is all the letter said.  The letter does not cite objective medical evidence, describe an inability to work, or give any medical diagnoses.  Furthermore, in early 2011, Plaintiff requested that Dr. Sharon write her a letter for full disability, (Tr. 186) but Dr. Sharon stated that he was unable to write her such a letter.  (Tr. 184, 186).  The fact that Dr. Sharon subsequently refused to classify Plaintiff

as disabled suggests that Dr. Sharon did not intend the jury duty letter to document an inability to work.  ALJ Krappa properly gave the letter little weight.

## **<u>CONCLUSION</u>**

For the reasons stated above, this Court finds that the ALJ's decision is supported by substantial evidence and will be affirmed.

__ s/ Stanley R. Chesler_____<br>STANLEY R. CHESLER, District Judge

Dated: May 10, 2013